Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| CONSEJO DE TITULARES DEL CONDOMINIO TORRE CIBELES<br><br>Apelados<br><br>v.<br><br>MORA DEVELOPMENT CORPORATION; RUGAM CORPORATION; RIGATI CORPORATION; COMPAÑÍA DE SEGUROS Y/O FIANZAS XYZ; Y FULANA DE TAL<br><br>Apelantes | KLAN202200456 | ***Apelación*** procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>K AC2016-0905<br><br>Sobre: Vicios de construcción |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Brignoni Mártir y la Jueza Rivera Pérez.[1]

Rodríguez Casillas, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de abril de 2023.

Comparece ante nos Mora Development (en adelante, Mora o apelante) mediante el presente recurso de apelación con interés de que revoquemos la Sentencia dictada el 12 de abril de 2022 por el Tribunal de Primera Instancia (en adelante, TPI), Sala de Superior de San Juan.[2] En dicho dictamen, se declaró ha lugar la demanda por vicios de construcción instada por el Consejo de Titulares del Condominio Torre Cibeles (en adelante, Consejo de Titulares o apelado) en contra de la parte apelante.

Por los fundamentos que expondremos a continuación, resolvemos confirmar el dictamen apelado.

**-I-**

Mora fue la desarrolladora del Condominio Torre Cibeles (en

---

[1] El 1 de marzo de 2023 la Hon. Maritere Brignoni sustituyó a la Hon. Gina Méndez Miró al cesar sus funciones en este Tribunal de Apelaciones. Véase, OATA2023-040.
[2] Notificada al día siguiente.

Número Identificador

SEN2023_____

adelante, Condominio) sito en el municipio de San Juan. Dicho proyecto consta de dos (2) torres de vivienda de 18 niveles para un total de 134 viviendas, un edificio de estacionamiento de tres (3) niveles, siete (7) unidades comerciales y áreas recreativas. Mora fungió como administrador del Condominio hasta el 23 de septiembre de 2014 cuando la administración fue transferida al Consejo de Titulares.

A dos años de transferida la administración, el Consejo de Titulares incoó el **23 de septiembre de 2016** una demanda[3] sobre vicios de construcción en contra de Mora[4]. Fundamentado en el informe preparado por la compañía Carcongroup Engineering, PSC (en adelante, Carcongroup) durante el proceso de transición, el Consejo de Titulares alegó que Mora responde por una suma no menor de $658,524.98 por los vicios y/o defectos de construcción de los cuales adolece el Condominio. El Consejo de Titulares señaló que, ante el caso omiso de Mora de corregir los defectos, se vieron obligados a proceder con la reparación de algunos de los vicios de construcción. En ese sentido, reclamaron también el reembolso de los gastos incurridos. El demandante adujo además que existen diferencias entre lo dispuesto en los planos aprobados en aquel entonces por la Administración de Reglamentos y Permisos (en adelante, ARPE) y lo construido por Mora. Por lo que solicitó una indemnización adicional de $302,649.17 para reparar tales discrepancias.

Mora presentó su contestación a la demanda donde negó la mayoría de las alegaciones en su contra.[5] Entre otras cosas, arguyó

---

[3] Apéndice 15 y 18 del recurso de apelación, págs. 104-114 y 126-132, respectivamente.
[4] Se incluyeron como codemandados a Rugam Corporation y Riati Coproration. Mediante segunda demanda enmendada de 1 de febrero de 2017, el Consejo de Titulares también incluyó como codemandado a PMJ Capital PR Corp.. No obstante, ante el desistimiento voluntario de la parte demandante, el 20 de marzo de 2018 el TPI dictó Sentencia Parcial desestimando la causa de acción a favor de los codemandados Rugam Corporation y Riati Corporation. El 2 de mayo de 2018, el TPI hizo lo propio en cuanto al codemandado PMJ Capital PR Corp.
[5] Apéndice 16 del recurso de apelación, págs. 115-120.

en su defensa que los alegados daños no constituyen vicios de construcción, sino que fueron autoinfligidos por el Consejo de Titulares ante la falta de mantenimiento al Condominio.

Luego de los trámites procesales de rigor, el **9 de septiembre de 2019** las partes presentaron el *Informe Preliminar de Conferencia con Antelación al Juicio*.[6] La parte demandante se mantuvo en su argumentación, mientras que Mora – con autorización del TPI – incluyó nuevas alegaciones en su defensa. En síntesis, Mora alegó que tras el paso del huracán María el Consejo de Titulares presentó una reclamación contra la póliza de seguro emitida a su favor por la aseguradora Chubb Insurance Company of Puerto Rico (en adelante, Chubb) por los mismos daños identificados como vicios de construcción en la demanda de epígrafe. De hecho, luego del proceso de ajuste Chubb le pagó $1.8 millones de dólares al demandante por la pérdida a la propiedad cubierta por la póliza. Mora adujo que el Consejo de Titulares no le informó a Chubb sobre el presente litigio, ni sobre los informes periciales existentes al momento de presentar la reclamación. En ese sentido, Mora arguyó que el Consejo de Titulares está impedido de recobrar los mismos daños imputados a Mora, toda vez que ello constituiría un enriquecimiento injusto por doble compensación.

El juicio en su fondo se celebró el **3, 4, 5 y 25 de febrero de 2020**. Por la parte demandante testificaron los peritos Ing. Jorge Bigas Mulero (en adelante, Bigas Mulero) e Ing. Javier Rodríguez Mejías (en adelante, Rodríguez Mejías), así como la Sra. Lizette Rodríguez Ortiz, la Sra. Anette Olivieri y la Sra. María de Lourdes Lugo Ortiz. La prueba testifical de la parte demandada consistió en el testimonio del Sr. Wilbert Ruíz Díaz, el Ing. Ed Joel Colón Rivera, el Sr. Christian López Ortiz (en adelante, López Ortiz), el Sr.

---

[6] *Id.*, Apéndice 9, págs. 74-88.

Humberto Donato Brugueras y el Sr. Eduardo Kimsi Palacios (en adelante, Kimsi Palacios). Así, en base a la prueba oral y documental presentada en el juicio, el juzgador de los hechos realizó las siguientes determinaciones de hechos pertinentes a la controversia que nos ocupa:

[…]

25. El 26 de agosto de 2011, el DACO emitió una Resolución en el caso SJ0004456, a raíz de una querella presentada por tres (3) titulares del Condominio. En esta se ordenó a MORA reparar, conservar e instalar ciertos servicios y facilidades, entre las cuales estaban la reparación de la vía de rodaje frente al área del contenedor de basura de la Torre I (este) y el reemplazo de todas las estructuras de toldo ubicadas en el tercer piso.

26. Posteriormente, el 25 de agosto de 2014, los querellantes presentaron una Moción Informativa en el DACo en la que solicitaron que, ante el incumplimiento con la Resolución del 26 de agosto de 2011, se presentara una Petición para Hacer Cumplir Orden (PHCO) en el tribunal.

27. El ingeniero Bigas Mulero, licencia de ingeniero número 9663, se dedica la ingeniería general, inspecciones, gerencia y forma parte de Carcongroup.

28. El ingeniero Bigas Mulero fue contratado por el Comité en el 2014, para realizar unas inspecciones visuales del Condominio y preparar un informe sobre las condiciones en las que encontraba.

29. Como resultado de su gestión preparó un documento titulado Informe detallado de las condiciones existentes del Condominio Torre Cibeles ubicado en el 592 y 596 de la Calle César González en la ciudad de San Juan, P.R. (Informe de Carcongroup).

30. El Informe Carcongroup contiene las condiciones encontradas en el Condominio, con recomendaciones y estimados de costos.

31. El ingeniero Bigas Mulero inspeccionó el Condominio el 21, 22, 23, 24, 28 y 29 de julio de 2014, para preparar el Informe de Carcongroup.

32. En las inspecciones físicas estuvieron presentes personal del equipo de Mora, el señor Luis Lugo y los representantes del Comité. A la inspección del 29 de julio asistió también el ingeniero Colón Rivera, en representación de Mora.

33. Además de la inspección visual, el ingeniero Bigas utilizó los planos del Condominio que Mora entregó al Comité.

34. Específicamente utilizó los planos de la Torres Este y de las áreas comunes.

35. El Informe de Carcongroup contiene una tabla identificada como Estimado de Costos de las medidas correctivas Listado de Deficiencias e incluye treinta y ocho (38) partidas, pareadas con la cuantía para su reparación y la referencia utilizada para llegar a dicha cuantía.

36. El Informe de Carcongroup contiene fotografías tomadas durante las inspecciones que reflejan el estado de las distintas áreas del Condominio según identificado por el ingeniero Bigas Mulero.

37. A base de la credibilidad que otorgamos al testimonio del ingeniero Bigas Mulero, en conjunto con la totalidad de la prueba, determinamos que el Condominio presentaba las deficiencias o vicios de construcción que desglosamos en la tabla a continuación y que corresponde a MORA

*compensar al Consejo por estas. Incluimos, también el costo para repararlas y la base utilizada para el cómputo:*

| Descripción de la Partida | Costo | Referencia |
|---|---|---|
| a. Reemplazo de las bombillas fundidas. | $2,432.00 | Se computó a base de 162 bombillas en las escaleras, con un costo de $12.50 por unidad; y 163 bombillas en los pasillos y lobby, con un costo de $2.50 por unidad. |
| b. Reemplazo de las lámparas que faltaban en los pasillos o que estaban dañadas | $1,500.00 | Se computó a base de 15 lámparas, a razón de $100.00 por unidad. |
| c. Instalar extensión de mofle de la planta eléctrica para cambiar la dirección en la que botaba el humo y pintar la base de la planta eléctrica | $2,500.00 | De esa cuantía, $2,000.00 fueron considerados para la extensión del mofle y $500.00 para la pintura y tratamiento contra la corrosión de la planta eléctrica |
| d. Reemplazo del gabinete de la manga de incendios en nivel 6 | $650.00 | Se estimó en esa cantidad, no se proveyó referencia. |
| e. Reemplazo de asfalto levantado por losa de hormigón donde está la estación de basura | $1,500.00 | Se computó a base de loza de hormigón reforzado de 20" x 10" = 200 pies cuadrado a $7.50. |
| f. Pintura del condomino (la pintura estaba deteriorada, reflejaba áreas de desgaste (wear and tear), áreas de descarado, áreas cubiertas con moho y áreas donde había que empañetar y luego pintar. | $283,184.46 | Se incluyó una cotización de JCR Multicolor, en el Anejo A del Informe |
| g. Reemplazo de brazo mecánico que faltaba | $100.00 | Estimado se hizo a base de los costos del mercado |
| h. Remplazar alfombra modular del gimnasio que estaba en mal estado y levantada | $5,995.75 | Se incluyó cotización de Fitness Warehouse en el Anejo D del Informe |
| i. Reemplazo de la cerradura de la puerta del almacén que da hacia el exterior del edificio este | $75.00 | Estimado se hizo a base de los costos del mercado. |
| j. Puerta doble con louver- reemplazo de la puerta que da hacia el exterior del cuarto eléctrico | $1,200.00 | Estimado se hizo a base de los costos del mercado. |
| k. Empañetados menores. En algunos lugares el empañetado estaba en mal estado o faltaba | $2,500.00 | Estimado se hizo a base de los costos del mercado. |
| l. Reemplazar manga de incendios en nivel 6 (la manga no estaba al momento de la inspección) | $350.00 | Estimado se hizo a base de los costos del mercado. |

| | | |
|---|---|---|
| m. Instalar poste que se cayó en el estacionamiento | $2,500.00 | Estimado se hizo a base de los costos del mercado. |
| n. Reparar el asfalto de la calle de acceso al estacionamiento comercial | $300.00 | Estimado se hizo a base de los costos del mercado. |
| ñ. Colocar sujetadores a la tubería expuesta estacionamiento comercial | $100.00 | Estimado se hizo a base de los costos del mercado. |
| o. Tratamiento de impermeabilización de techos de la entrada de los edificios y terraza de la piscina. El de la terraza de la piscina no la tenía. | $5,000.00 | Estimado se hizo a base de los costos del mercado. |
| p. Reparación del sistema de bombas de agua contra incendios. | $475.00 | Estimado se hizo a base de los costos del mercado. |
| q. Reemplazo de la loza de pared en el lobby del edificio este | $100.00 | Estimado se hizo a base de los costos del mercado. |
| r. Reemplazo de la tubería de drenaje roto en patio del edificio oeste | $50.00 | Estimado se hizo a base de los costos del mercado. |
| s. Arreglo de los jardines con topsoil en áreas desniveladas. | $600.00 | Estimado se hizo a base de los costos del mercado. |
| t. Reparación de los receptáculos dañados en el estacionamiento. Los enchufes se veían oxidados, a algunos les faltaba la tapa. | $360.00 | Estimado se hizo a base de los costos del mercado. |
| u. Instalación del sistema de "beepers" de acceso al complejo según ordenado por DACO | $6,420.00 | Se incluyó cotización. |
| v. Reemplazo del aire acondicionado de cinco toneladas en el salón de actividades. Estaba dañado. | $5,000.00 | Estimado se hizo a base de los costos del mercado. |
| w. Elevar el nivel de la planta eléctrica exterior aproximadamente cinco pies por estar en área inundable. | $3,500.00 | Estimado se hizo a base de los costos del mercado. |
| x. Reparación de la tubería sanitaria en el techo del área de almacenaje de los residentes en el edificio oeste. | $300.00 | Estimado se hizo a base de los costos del mercado. |
| y. Reparación de las escaleras del estacionamiento | $150.00 | Estimado se hizo a base de los costos del mercado. |
| z. Marmolizar la piscina y llenarla de agua | $15,000.00 | Estimado se hizo a base de los costos del mercado. |
| aa. Reponer manecillas que faltan en los gabinetes contra incendios de los edificios | $75.00 | Estimado se hizo a base de los costos del mercado. |
| bb. Tratamiento de impermeabilización del techo de la Torre II por problemas de filtración de agua | $107,220.00 | Cotización provista por Imperpro Builders LLC |
| cc. Terminación del empañetado en la base de los techos del pedestal eléctrico en el edificio oeste | $1,500.00 | Estimado se hizo a base de los costos del mercado. |
| | | |

38. El costo total para realizar las reparaciones antes detalladas (excepto las incluidas en los incisos (h), (u) y (v)) al 18 de septiembre de 2014, fecha en que se preparó el Informe de Carcongroup era de $433,221.46. Para actualizar lo que costaría realizar las medidas correctivas al presente, se le añadirá a esta cuantía un tres por ciento (3%) de inflación por año.

39. Algunas de las veinticinco (25) cortinas de lona, cuyo costo fue estimado por el ingeniero Bigas Mulero, fueron repuestas por MORA, a través del señor Cleofe Rubí. De la prueba presentada no se pudo establecer la cantidad concreta.

40. En la Torre II, o Torre Oeste, se había hecho un trabajo de impermeabilización, pero, aun así, el edificio tenía problemas de filtraciones.

41. El ingeniero Bigas Mulero desconocía la fecha en que se había hecho dicho trabajo, si existía alguna garantía vigente y tampoco se le entregó documentación sobre ello. El Informe de Carcongroup fue divulgado a MORA al momento de la transición.

42. El ingeniero Rodríguez Mejías es ingeniero civil con número de licencia 14639.

43. También posee una licencia de corredor de bienes raíces, número 9025 y una de evaluador de bienes raíces o tasador, número 761. Además, tiene una certificación como gerente de proyectos.

44. El ingeniero Rodríguez Mejías, además, completó su maestría en gerencia de construcción, hace veinticinco (25) años. Su experiencia durante ese periodo incluye: trabajo en una compañía familiar de construcción; gerencia en construcción e inspección; servicios de peritaje en más de cien (100) casos; y ha fungido como profesor universitario.

45. El ingeniero Rodríguez Mejías fue contratado para rendir un informe pericial sobre las condiciones de las facilidades al momento de la transferencia entre el desarrollador y el Consejo de Titulares.

46. El informe lo preparó el 18 de febrero de 2016 y se titula: Reporte de Inspección Visual (Reporte).

47. El ingeniero Rodríguez Mejías inspeccionó el edificio en el 2016 y utilizó los planos que le entregó MORA al Comité en el proceso de transición.

48. Posteriormente, en el 2018, visitó lo que se conocía como ARPE, pero no encontró diferencia entre los planos que allí había con los que había examinado para hacer la inspección.

49. Su trabajo incluyó la evaluación de las diferencias mayores entre lo construido y lo mostrado por los planos aprobados en aquel momento por ARPE.

50. Los hallazgos del ingeniero Rodríguez Mejías reflejan que MORA omitió trabajos en la construcción del Condominio que debieron haber sido realizados, según los planos aprobados por la ARPE.

51. De igual forma, hubo trabajos realizados que no cumplen con la reglamentación aplicable o que se hicieron de forma deficiente y, por ende, impiden el uso y disfrute de las facilidades.

52. El Reporte contiene una tabla titulada: Estimado de Costos Desviaciones de Planos Aprobados. Esta desglosa las desviaciones de lo construido conforme a los planos aprobados, así como instancias donde lo construido no cumple con la reglamentación o legislación aplicable.

53. A base de la credibilidad otorgada al testimonio del ingeniero Rodríguez Mejías y de la prueba presentada, evaluada conjuntamente con la de la parte demandada, determinamos que las desviaciones y el costo para

adecuar la realidad de lo construido o subsanar las deficiencias son las siguientes:

a. Instalar una pluma para manguera en el área de desperdicios sólidos (entrada) conforme a hoja SA-1, con un costo de $700.00.

b. Pintar doce (12) flechas en área de rodaje en niveles de estacionamiento conforme a hoja A-1.2, con un costo de $570.00. Esto en el edificio de estacionamiento.

c. Instalación de tres (3) luminarias tipo E-7 en el edificio de estacionamiento conforme a hoja E-1, con un costo de $1,260.00. El costo incluye tener que instalar tubería expuesta.

d. Resanar y pintar plafón del nivel terrero del edificio de estacionamiento, 16,541 pc, conforme al Extracto del Cuadro de Terminaciones en la hoja A-4.2, con un costo de $24,811.50.

e. Extender el pasamano en la escalera del edificio del estacionamiento para cumplir con la sección 1003.3.3.6 del Código UC-1997, para un total de veintiún (21) extensiones, con un costo de $735.00.

f. Reparar superficie desprendida sobre las juntas de expansión entre el edificio de estacionamiento y el de vivienda, con ciento veinte (120) planchuelas de aluminio de 4"x 1/8", con un costo de materiales y mano de obra de $1,320.00.

g. Instalación de parrillas continuas en la parte baja de las rampas del estacionamiento, según extracto de la hoja SP1.3, con un costo de $2,255.50.

h. Instalación en los edificios de vivienda de un sistema de intercom con video y audio según especificado en la hoja E-22 de los planos, con un costo de $75,888.00. El sistema que se instaló era solo uno de voz.

i. Instalación de siete (7) registros sanitarios en los edificios de vivienda, conforme a la hoja P1.1, con un costo de $1,645.00.

j. Instalación de receptáculo eléctrico en pared de vestíbulo de edificio de vivienda conforme a extracto de la hoja E-5, con un costo de $320.00.

k. Instalación de seis (6) louvers en puertas de baño, janitor y cuarto eléctrico, conforme a extracto de la hoja A-4.1, con un costo de $585.00.

l. Instalación de nueve (9) rótulos de salida de emergencia en los edificios de vivienda, conforme a extracto de la hoja E-4, para un costo de $978.75.

m. Instalación una (1) lámpara tipo L-6 en el cuarto eléctrico de la Torre Este, conforme a extracto de la hoja E-4, con un costo de $200.00.

n. Instalación en varias áreas de los edificios de vivienda de speaker horn strobe, como parte del sistema de alarma contra incendios, conforme a extracto de hoja E-4, a un costo de $2,888.00.

o. Instalación de desagüe de piso en la escalera del primer nivel de ambas torres de vivienda, conforme a extracto de la hoja P1.1, con un costo de $370.00.

p. Reparar escalones en las Torres Este y Oeste para producir inclinación de una (1) pulgada y nivelar la altura, en treinta y siete (37) niveles, con un costo de $21,460.00. Esto surge del detalle 3/A-3.9 que indica el requisito de inclinación de 1" en el espejo de los escalones.

q. Reparación de pasamano en las escaleras de las Torres Este y Oeste para darle continuidad conforme a lo establecido en la sección 1003.3.3.3 de código UBC 1997, con un costo de $5,320.00.

r. Instalación de intercom en el área de refugiados de las escaleras de las Torres Este y Oeste, conforme a extracto de la hoja E-22, con un costo de $38,888.00.

s. Instalación de over flows en los parapetos de varios aleros de ambas torres, conforme a extracto de la hoja A-1.5E, con un costo de materiales y mano de obra de $910.00.

t. Aplicación de material tipo fire stop en perforaciones de cuartos eléctricos en edificios de vivienda, con un costo de $5,600.00.

u. Anclaje de tuberías en cuarto eléctrico y telefónico en edificio de vivienda, con un costo de $1,988.75.

v. Identificación de circuitos en paneles eléctricos en los edificios de vivienda, con un costo de $1,350.00. Algunos de estos paneles tenían, además, espacios de brakers spare sin protección.

w. Extender rociadores contra incendio en cuarto de contadores de agua, con un costo de materiales y mano de obra de $1,500.00. En este cuarto se construyó una pared interior en el cuarto que no estaba en el plano y el único rociador no cubre la totalidad del área. Esta condición ocurre en todos los cuartos de contadores de agua en ambas torres de vivienda.

x. Instalación de soporte vertical en tubos de cobre en los cuartos de janitor service, en varios cuartos de los edificios de vivienda, con un costo de materiales y mano de obra de $975.00.

y. Construcción de muro de seis (6) pulgadas en puerta de azotea de las Torres Oeste y Este, conforme al Detalle 5/A-3.9, con un costo de $185.00. Este muro es para evitar la infiltración de agua.

z. Modificación de marco de la puerta de azotea de edificio de vivienda para el pestillo de la cerradura, con un costo de $77.50.

aa. Instalación de exhaust fan en el techo del cuarto del tanque de diésel, conforme a extracto de la hoja E-16, con un costo de $1,425.00. Se consideró un extractor de 3,000 CFM.

bb. Instalación de breaker en panel de distribución del cuarto de generador eléctrico de edificio de vivienda, con un costo de $60.00.

cc. Instalación de equipos de juego en área recreativa al lado de la Torre Oeste, conforme extracto de la hoja S1-2, con un costo de $8,425.00. Los equipos no fueron instalados y la configuración de las áreas verdes fue variada.

dd. Conformar planos para incluir área de juego y piscina según construida, con un costo de $2,500.00. Lo construido no corresponde a lo que surge del extracto de la hoja S1-2 de los planos identificados como As-Built.

ee. Instalación de verja de metal galvanizado en área de piscina conforme a extracto de la hoja SA-2, con un costo de $10,750.00. En su lugar, se construyó una verja de PVC.

ff. Instalación de todos los rótulos en borde de piscina, conforme a extracto de la hoja SA-2, con un costo de $500.00.

gg. Instalación de mueble en área del gazebo, conforme a extracto de la hoja SA-2. 1. Se incluye costo para mueble de madera, con tope en PVC laminado y fregadero, con un costo de $2,500.00.

55. El ingeniero Rodríguez Mejías estimó los costos a base de su experiencia en la industria, búsquedas que hizo en el Internet, excepto en los casos que utilizó cotizaciones

*verbales de Miguel Iron Work y BTC Communication y que desglosamos en los próximos incisos.*

56. *En el caso de los incisos (e), (g), (p), y (dd), se obtuvo cotización verbal de la compañía Miguel Iron Work. El ingeniero Rodríguez Mejías había utilizado esta compañía anteriormente.*

57. *En el caso de los incisos (h), (n) y (q), se obtuvo cotización verbal de la compañía BTC Communication, quien había realizado trabajos en el Condominio y conocía los planos.*

58. *El costo total de reparar o adecuar a los planos las deficiencias antes señaladas ascendía a la fecha del Reporte a $302,649.17, que se desglosa en $221,721.00 de costo directo total; $11,086.05 de costo indirecto proyecto (5%); $58,201.76 de overhead central and profit (25%); y $11,640.35 de IVU (calculado a razón de 4% en ese momento).*

59. *Al costo directo total habría que aumentarle al presente un quince por ciento (15%), según la experiencia del ingeniero Rodríguez.*

60. *El cinco por ciento (5%) relacionado a costos indirectos se refiere a costos que no son materiales y labor pero que son necesarios, tales como los costos del field, el servicio de recogidos de materiales, desperdicios sólidos y otros.*

61. *El veinticinco por ciento (25%) de gastos de overhead y profit, se refiere a los costos de oficina central, como secretaria, internet y gastos de oficina, asignados al proyecto. Este se divide en quince por ciento (15%) de ganancia y diez por ciento de (10%) de overhead.*

62. *Estos costos tienen que aplicarse a todas las partidas.*

63. *El costo del cuatro por ciento (4%) del IVU hay que computarlo al presente a base de once punto cinco por ciento (11.5%).*

64. *Los costos computados por el ingeniero Rodríguez Mejías son distintos a los del ingeniero Bigas Mulero porque no se refieren a las mismas partidas.*

65. *El 20 de septiembre de 2017, Puerto Rico recibió el impacto del huracán María.*

66. *El Condominio sufrió daños a raíz del paso del huracán, por lo que hizo una reclamación al seguro.*

67. *Olivieri es corredora de bienes raíces y residente del Condominio y fue portavoz alterna del Comité de Transición.*

68. *Olivieri participó en la fase final de la reclamación a CHUBB, específicamente en lo que tuvo que ver con la oferta final y la aceptación por el Consejo.*

69. *Luego del paso del huracán, Olivieri colaboró con las inspecciones de los apartamentos que hicieron los ajustadores públicos contratados por el Condominio.*

70. *Olivieri estaba familiarizada con las partidas generales reclamadas a la aseguradora, pero no con los detalles porque era un informe técnico.*

71. *En la asamblea extraordinaria del 25 de septiembre de 2018, los ajustadores públicos Mark Parkinson y William Shaw explicaron los detalles de la reclamación que presentaron a CHUBB y las ofertas recibidas.*

72. *La oferta final de CHUBB fue de $1,066,866.97, esto luego del deducible del dos por ciento (2%). Al restar un primer y segundo adelanto de $75,000.00 y $250,000.00, respectivamente, el pago total pendiente a la fecha de la asamblea extraordinaria del 25 de septiembre de 2018 era de $741,000.00. A esa suma se le restó el doce por ciento (12%) de la comisión del ajustador público, que fue de $128,024.04.*

73. *La reclamación a CHUBB incluyó partidas que estaban en el Informe de Carcongroup, específicamente los toldos, la pintura y la impermeabilización de los techos. No obstante,*

el huracán causó daños adicionales tanto en el techo, como en la pintura del edificio.

74. Los ajustadores incluyeron estos daños en la reclamación que hizo el Condominio tras el paso del huracán.

75. El Condominio se empañetó y pintó con el dinero obtenido de la reclamación al seguro. Esto fue una prioridad para el Consejo. Otras partidas relacionadas con otros daños causados por el huracán se quedaron sin atender.

76. Los toldos del estacionamiento fueron reemplazados con el dinero recibido de la reclamación.

77. La Tabla de la Oferta Final se les distribuyó a los titulares.

78. Olivieri firmó el Sworn Statement in Proof of Loss, el 26 de septiembre de 2018.

79. Lugo Ortiz fue miembro del Comité de Transición y reside en el apartamento 1222 del Condominio.

80. Lugo Ortiz también fue miembro de la Junta del Condominio entre el 2016 y 2017. Luego se ha mantenido como enlace con dicho organismo y la representación legal de este caso, por lo que conoce lo alegado en la Demanda y Demandas Enmendadas.

81. Su rol en el Comité consistió en la redacción del Informe del Comité de Transición, así como participar en las reuniones y estar presente en las inspecciones.

82. Lugo Ortiz también se encargó de recopilar los datos y documentos relacionados a los gastos de mitigación.

83. El Exhibit H de la parte demandante contiene facturas que dicha parte identifica como relacionadas a los gastos de mitigación.

84. Estas facturas fueron entregadas a Lugo Ortiz por cada junta, según se fueron haciendo arreglos que no podían esperar.

85. No todas las facturas incluidas en el Exhibit H se pueden relacionar a los defectos enumerados en el informe de Carcongroup.

86. Las partidas que Lugo Ortiz pudo relacionar con los defectos o deficiencias de los informes de los peritos fueron: instalación del control de acceso (costó $10,317.45, se escogió uno de pegatinas más costoso que el que debió instalar MORA); arreglo del aire acondicionado del salón de actividades (costó $2,375.00), pago del piso del gimnasio ($5,335.12); trabajo de comején subterráneo [($]10,470 .00).

87. De estas partidas reconocemos como gastos de mitigación que MORA debe compensar, las primeras tres:
    a. instalación del control de acceso, por una cuantía de $6,420.00, conforme estimado por el ingeniero Bigas Mulero;
    b. arreglo del aire acondicionado del salón de actividades, por una cuantía de $2,375.00;
    c. pago del piso del gimnasio, por una cuantía de $5,335.12.

88. Hubo varias facturas que Lugo Ortiz no pudo relacionar con la tabla preparada por el ingeniero Bigas Mulero. Entre ellas están la reparación de las bombas de incendio; arreglos eléctricos que surgen de las páginas 13 a la 17 del Exhibit H; factura relacionada al mantenimiento del generador; y la factura sobre el reemplazo del sistema de fotoceldas.

89. Lugo Ortiz no pudo relacionar específicamente las facturas de los gastos de mitigación alegados, con las tablas preparadas por los ingenieros Bigas Mulero y Rodríguez Mejías, excepto las incluidas en la determinación de hecho número 86.

90. Ruiz Díaz es corredor de bienes raíces y fue empleado de Mora desde diciembre del 2006 hasta mayo de 2015.

91. *Ruiz Díaz fue el project manager del Condominio y encargado de las relaciones bancarias.*

92. *Entre sus funciones estaban coordinar los punch list para las unidades (el punch list es el documento que se prepara cuando un cliente, antes del cierre ve defectos, para que el contratista las trabaje y se corrijan); coordinar cierres y asistir a algunos de estos a firmar las escrituras; verificar los apartamentos modelos para asegurarse que estuviera todo en orden; estaba pendiente a las ventas; aprobaba los anuncios; revisaba las querellas presentadas en DACO.*

93. *Ruiz Díaz participó en la transición, como representante de MORA en conjunto con el licenciado Garay.*

94. *Durante ese proceso, Ruiz Díaz era la persona que entregaba los documentos que requería el Comité de Transición.*

95. *Ruiz Díaz entregó la fotocopia de la fianza de fidelidad por $25,000.00, al Comité de Transición, así como un cheque por $115,783.56 de la cuenta escrow.*

96. *Ruiz Díaz no participó en las inspecciones que hizo el ingeniero Bigas Mulero del Condominio.*

97. *El ingeniero Colón Rivera tiene un bachillerato en ingeniería civil de la Universidad Politécnica de Puerto Rico. Su licencia es la número 17078 y lleva ejerciendo la profesión desde el 2001.*

98. *El ingeniero Colón Rivera participó en varios proyectos con MORA y afiliadas a esta. En el caso del Condominio, se le pidió que fuera a una visita de inspección con el ingeniero Bigas Mulero.*

99. *El ingeniero Colón Rivera recorrió varias áreas del Condominio con el ingeniero Bigas Mulero. Recuerda haber ido al área donde se deposita la basura, cuartos de almacenaje, gimnasio, estacionamiento, el lobby, área de las facilidades donde está la piscina, área de la cisterna, afueras y patios de los edificios.*

100. *López Ortiz es Ajustador de Propiedad y Contingencia en CHUBB hace siete (7) años y posee una licencia del Comisionado de Seguros.*

101. *López Ortiz fue el ajustador interno que trabajó la reclamación del Condominio tras el paso del huracán María. Es la única reclamación que ha manejado del Condominio.*

102. *Como ajustador interno, López Ortiz se encargaba de lo siguiente: mantenía el expediente digital de la compañía; recogía la información de los proveedores de CHUBB y de los ajustadores independientes que trabajaban la reclamación en el campo (field); recogía la evidencia del ajustador público que llevaba ese caso; y las autorizaciones. Además, era el enlace entre sus superiores y el ajustador independiente que llevaba el caso y facilitaba las autorizaciones y todo el manejo del expediente.*

103. *CHUBB asignó a la compañía Eduardo Kimsi & Asociados (KIMSI), para su representación e investigación de campo, mientras el Condominio (asegurado) contrató a los ajustadores públicos, BLC. Ambas compañías prepararon sus informes.*

104. *López Ortiz no había visto el informe de Carcongroup y este no consta en los archivos de CHUBB.*

105. *El ajustador independiente contratado por CHUBB, hizo la investigación de campo, la valorización de los daños que el Condominio (asegurado) reclamó y, a raíz de ello, preparó un informe de valorización.*

106. *El ajustador público contratado por el Condominio (asegurado), medió entre este y la aseguradora.*

107. En las reuniones de ambos ajustadores se utilizaron los informes de KIMSI y BLC. El informe contiene la valorización de todos los daños, incluyendo los de los apartamentos y los de la estructura.

108. En el Informe de BLC se incluyeron partidas para pintura de exterior como de interior (apartamentos).

109. La partida que BLC estimó para pintura incluyó la reparación del exterior del edificio.

110. López Ortiz no pudo precisar cuánto se pagó por la pintura.

111. López Ortiz podría identificar un daño previo a un daño provocado por el huracán en sí.

112. El ajustador tiene la responsabilidad de identificar si hay daños preexistentes a los que se reclaman. El asegurado no tiene ninguna responsabilidad en esa función.

113. Donato Brugueras se dedica a la venta de seguros en calidad de productor de seguros desde 1968.

114. Como productor de seguros, sus funciones incluyen representar, proteger y cubrir adecuadamente a sus clientes en cuanto a las exposiciones de seguro, mayormente las de propiedad y contingencia.

115. Al momento de recomendar o preparar la póliza para el Condominio, lo visitó, verificó sus by laws, corroboró su valor. De ese presunto valor, que lo estima un tercero, no el Condominio, es que se parte. Ese tercero revisa el valor cada dos (2) años.

116. Donato Brugueras también solicitó una información general al Condominio, relevante para generar la póliza. Caminó por el Condominio, pero no lo inspeccionó.

117. Donato Brugueras tenía un conocimiento general del caso ante nuestra consideración. Sabía que el contratista estaba demandado y que había unas partidas reclamadas porque no se construyeron o no se terminaron.

118. Donato Brugueras hizo las valoraciones y las cubiertas que necesitaba para diseñar la póliza del Condominio y la mercadeó a toda la industria.

119. En ese proceso no proveyó a CHUBB ni a ninguna otra compañía información sobre la demanda de autos.

120. Donato Brugueras era el productor de seguros para el condominio en el 2017.

121. Luego del paso del huracán Maria le presentó varias alternativas al Condominio sobre cómo presentar y preparar la reclamación a la compañía aseguradora.

122. La asamblea en pleno del Condominio decidió hace la reclamación a través de un ajustador público (BLC).

123. Donato Brugueras se reunió en una ocasión con los ajustadores públicos para verificar que hubieran recibido la información correcta.

124. En esa reunión se discutieron datos generales de la póliza. Estos ajustadores eran personas muy cuidadosas y bien preparadas en cuanto a saber qué era lo que comprendía la póliza.

125. Kimsi Palacios es ajustador profesional de reclamaciones hace más de 30 años. Su número de licencia es 3000196765, y esta fue expedida por el Comisionado de Seguros de Puerto Rico.

126. Es un ajustador independiente que se especializa en eventos catastróficos y, a través de su empresa, ha trabajado para CHUBB y para otras compañías.

127. Las compañías los designan para llevar a cabo las investigaciones con respecto a las reclamaciones que les presentan.

128. En un evento catastrófico, inspecciona los daños del inmueble asegurado, determina si existe una cobertura bajo un contrato de seguro y, si esta existe, hace una

recomendación de pago que está sujeta a la aprobación de la compañía de seguros.

129. Su interacción con los asegurados incluye orientarlos sobre cómo presentar su reclamación, qué información debe presentar; y acelera el proceso para llegar a un acuerdo con la compañía de seguros en el menor tiempo posible.

130. CHUBB le asignó la reclamación del Condominio. El Condominio había designado a BLC para que representara sus intereses. Esta última trabajó en la integración de la reclamación y presentó un documento en el que le indicó a CHUBB, a través de Kimsi Palacios, cuál era el costo de llevar a cabo la reparación del inmueble.

131. Lo primero que hizo Kimsi Palacios una vez supo que había un ajustador público, fue llevar a cabo una inspección conjunta del edificio dañado para establecer cuál sería el programa de obra y después acordar con él los precios unitarios que se iban a utilizar para establecer el costo de la reparación. Todo su trabajo para determinar cuál era la pérdida indemnizable lo realizó directamente con el ajustador público.

132. Luego de considerar el programa de obra y las partidas que se consideraron para efectos de la indemnización, se determinó que el monto a compensar era $1,858,843.07.

133. Ente las partidas incluidas en el informe y los costos aprobados para ellas están:

| Partida asignada a base de lo reclamado por el asegurado, luego de ajustes | Área |
| --- | --- |
| $122,044.62 | Recubrimiento y reemplazo del impermeabilizante del techo de las torres, a razón (página 9 de la tabla, Exhibit 4 parte demandada) |
| $264,595.98 | Pintura y preparación de superficie de la Torre Este (página 1 de la tabla) |
| $9,086.57 | Bomba de agua potable y de incendios (páginas 16 y 17). |

134. El techo de las torres del Condominio recibió impactos durante el paso del huracán María y se tenía que reemplazar en su totalidad, independientemente de que hubiera una parte dañada.

135. Las partidas otorgadas por la aseguradora para la pintura comprenden la reparación de la fachada por impactos sufridos por el paso del huracán.

136. No se puede separar de esta partida cuánto corresponde solo a la pintura.

137. Los vientos del huracán María tuvieron un efecto corrosivo sobre la fachada de los edificios, pero no provocaron daños estructurales al Condominio. Sí sufrió daños que requirieron empañetado de la fachada y esto se contempló en el Informe de Kimsi.

138. Kimsi Palacios no tuvo acceso al Informe de Carcongroup, durante el proceso de ajuste del reclamo, sino que vio este documento dos semanas antes de prestar su testimonio.

139. Kimsi Palacios no tenía conocimiento de la existencia del Informe de Carcongroup o de que se había presentado la demanda de autos al momento de preparar su informe.[7]

---

[7] Apéndice 8, págs. 22-43.

En virtud de lo anterior, el **12 de abril de 2022** el TPI dictó la Sentencia aquí apelada donde concluyó que Mora responde por: **(1)** la suma de $433,221.46 por concepto de las deficiencias o vicios de construcción presentados por el Condominio; **(2)** $302,649.17 para reparar y adecuar ciertas deficiencias de la estructura con los planos originales del Condominio, conforme aprobados por ARPE; y **(3)** la suma de $14,130.12 por concepto de gastos de mitigación incurridos por el Consejo de Titulares. Asimismo, el TPI resolvió que no aplicaban al presente caso las doctrinas de enriquecimiento injusto y actos propio. Con respecto a la doctrina de fuente colateral, el foro apelado razonó que lo recibido por el Consejo de Titulares en virtud del contrato de la póliza de seguro no constituye una doble compensación; puesto que aun cuando las partidas reclamadas coinciden con algunos de los defectos reclamados a Mora, estos surgen de causas de acción distintas.

Inconforme, Mora solicitó el **28 de abril de 2022** la reconsideración del dictamen; lo cual fue denegado por el TPI mediante Orden de **12 de mayo de 2022**.[8]

Aun en desacuerdo, Mora acudió ante este Tribunal mediante el presente recurso de apelación en el cual alegó que el TPI incidió:

> *[a]l validar las actuaciones contradictorias de la parte demandante, resultando ello en una impermisible doble compensación.*
>
> *[a]l conceder partidas basado exclusivamente en el hecho de que las mismas están incluidas en un informe pericial no obstante a que el perito no pudo sostener los aspectos básicos de cantidad y costos.*

Habiendo comparecido el Consejo de Titulares mediante alegato en oposición y, con el beneficio de la transcripción de la prueba oral, procedemos a resolver.

**-II-**

**A. Apreciación y estándar de la prueba en casos civiles.**

---

[8] Notificada originalmente el 13 de mayo de 2022. Sin embargo, la orden fue objeto de una notificación enmendada el 23 de mayo de 2022.

Sabido es que los tribunales apelativos, de ordinario, aceptan *"como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala"*.[9] A pesar de ello, en ocasiones, la deferencia al arbitrio del juzgador de los hechos no es absoluta.[10] De manera, que:

> *[a]unque alguna prueba sostenga las determinaciones de hechos del tribunal, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas.[11]*

En cuanto a las determinaciones de hecho y conclusiones de derecho, la Regla 42.2 de Procedimiento Civil apunta que:

> *[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos.[12]*

Dicho de otro modo, las determinaciones de hechos basadas en la credibilidad conferida por el juzgador a los testigos que declaren ante sí merecen gran deferencia.[13] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[14] Por tanto, nuestra intervención con la evaluación de la prueba testifical procede únicamente cuando un análisis integral de la misma *"nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia"*.[15] De ahí, que nuestro reglamento establece que cuando una parte señale algún error relacionado con la suficiencia de la prueba

---

[9] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013).
[10] *Ibid.*
[11] *Id.*, pág. 772.
[12] 32 LPRA Ap. V, R. 42.2.
[13] *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009).
[14] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[15] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012).

testifical o la apreciación errónea de la misma, deberá someter una transcripción, exposición estipulada o narrativa de la prueba.[16]

Ahora bien, la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio. [17] Incluso, podemos descartarla aunque sea técnicamente correcta.[18]

Con respecto al valor probatorio que le otorgue el TPI a los testimonios periciales, la Regla 702 de Evidencia señala que:

> *[e]l valor probatorio del testimonio dependerá, entre otros, de:*
> *(A) si el testimonio está basado en hecho o información suficiente;*
> *(B) si el testimonio es el producto de principios y métodos confiables;*
> *(C) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso;*
> *(D) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica;*
> *(E) las calificaciones o credenciales de la persona testigo, y*
> *(F) la parcialidad de la persona testigo.*[19]

La citada regla establece una serie de factores que inciden sobre el valor probatorio del testimonio pericial, cuyo fin último es ayudar al juzgador a entender determinada prueba o hecho en controversia. [20] De modo, que: *"el juzgador de hechos no está obligado a aceptar las conclusiones de un perito. Por lo tanto, si luego de aquilatar el testimonio pericial, el juzgador concluye que no merece credibilidad, este tiene la facultad de rechazarlo".*[21]

## B. Doctrina de la "fuente colateral"

La doctrina de fuente colateral entra en escena cuando en un

---

[16] Regla 19 (A) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 19 (A). Véanse, además, Reglas 19 (B), 20, 76 (A) y (E).
[17] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011); *Arrieta v. De la Vega*, 165 DPR 538, 551 (2005).
[18] *Ibid.*
[19] 32 LPRA, Ap. VI, R. 702.
[20] E. Rivera García, *El valor del testimonio pericial en los procesos judiciales,* 47 Rev. Jur. U. Inter. P.R. 87, 99-100 (2013).
[21] *Id.,* pág. 101.

pleito el demandado levanta como defensa la llamada "doble compensación" o la acumulación de indemnizaciones. La doctrina de la fuente colateral impide que el causante de un daño deduzca del importe de la indemnización la compensación o los beneficios que haya recibido el perjudicado de una tercera persona o entidad, **no relacionada** con el demandado.[22] Ello, con el propósito de que el causante del daño no se beneficie del derecho de un demandante a los beneficios provenientes de un tercero que sufraga parte de los gastos que le corresponden al causante del daño.[23] Entiéndase por tanto, que la relación del tercero que concede beneficios al perjudicado es completamente distinta a la que tiene éste con el causante de sus daños.[24] Nuestro Tribunal Supremo ha favorecido la doctrina, pues su aplicación no conlleva una doble compensación con cargo al demandado, mientras que su no aplicación *"perjudicaría al demandante -víctima- ya que él pagó las primas, en el caso del seguro, o soportó los descuentos para, por ejemplo, la pensión de retiro y otros"*.[25]

Ahora bien, la doctrina de fuente colateral no debe aplicarse de manera automática; sino que *"en cada caso **debe examinarse el origen y propósito del beneficio colateral en cuestión**, para decidir entonces si éste se deducía o no de la indemnización que debía pagar el causante del daño"*.[26] Así, al aplicar la doctrina el tribunal debe identificar la naturaleza de la suma que recibió el perjudicado de un tercero; si es una indemnización, su causa de acción queda extinguida ya que se reparó el daño sufrido; pero si se trata de una suma abonada por otro título, la víctima conserva su acción contra

---

[22] *Silva Soto v. Suiza Dairy Corporation,* 2023 TSPR 14, 211 DPR ___ (2023); *Futurama Import Corp. v. Trans Caribbean,* 104 DPR 609, 611-612 (1976) (Per Curiam). Énfasis suplido.
[23] *Silva Soto v. Suiza Dairy Corporation,* supra.
[24] *Nieves Cruz v. UPR,* 151 DPR 150, 165 (2000).
[25] *Futurama Import Corp. v. Trans Caribbean,* supra, pág. 613.
[26] *Silva Soto v. Suiza Dairy Corporation,* supra, citando a *Nieves Cruz v. UPR,* supra, págs. 165-166. Énfasis suplido.

el autor del daño.[27]

**-III-**

Comenzamos por señalar que Mora no cuestiona la determinación del TPI en cuanto a que dicha parte responde por los gastos incurridos por el Consejo de Titulares para la mitigación de los daños. Así tampoco, recurre de la decisión imponiéndole responsabilidad por las discrepancias habidas entre el plano aprobado por ARPE y lo verdaderamente construido. Mas bien, Mora cuestiona la concesión de ciertas partidas por vicios o defectos de construcción incluidas en la determinación de hecho #38 de la Sentencia por las siguientes razones: **(1)** doble compensación; y **(2)** los costos no están sustentados por la prueba pericial y documental. Luego de examinar el expediente y con el beneficio de la prueba oral, resolvemos que no le asiste la razón.

En primer orden, Mora argumenta que no procede la indemnización concedida al Consejo de Titulares por los siguientes vicios o defectos de construcción: **(1)** pintura del exterior del edificio ($283,184.46), **(2)** impermeabilización del techo ($107,220.00) y **(3)** reparación de las bombas de agua ($475.00). Aduce que la parte apelada reclamó tales vicios a su aseguradora como daños sufridos a la propiedad tras el paso del huracán María; y que tras la correspondiente investigación y ajuste, Chubb compensó al Consejo de Titulares por la suma total de $395,727.17.[28] En ese sentido, Mora alega que la indemnización concedida por el TPI a favor del Consejo de Titulares por la pintura del exterior del edificio, la impermeabilización del techo y la reparación de las bombas de agua constituye una doble compensación.

---

[27] *Futurama Import Corp. v. Trans Caribbean,* supra, pág. 613.
[28] Los $395,727.17 se distribuyeron por Chubb de la siguiente manera: **(1)** $122,044.62 para el recubrimiento y reemplazo del impermeabilizante del techo; **(2)** $264,595.98 para pintura y preparación del edificio; y **(3)** $9,086.57 para el motor de la bomba de agua potable y de incendios.

No existe controversia en cuanto a que – con posterioridad a la presentación de la demanda de epígrafe - el Consejo de Titulares presentó una reclamación contra la póliza de seguro expedida por Chubb por los daños sufridos al Condominio como consecuencia del huracán María. Entre las partidas reclamadas, ciertamente se encontraban la pintura del exterior del edificio, la impermeabilización del techo y la reparación de la bomba de agua. Sin embargo, conforme a la prueba ofrecida ante el foro primario, Mora no logró demostrar una sinergia total entre tales partidas y los vicios de construcción reclamados a Mora. Por ejemplo, los testigos de la parte apelante no lograron precisar el detalle de lo verdaderamente incluido (pintura, empañetado, materiales, mano de obra, etcétera) y compensado por la aseguradora por la partida de la pintura, versus lo exigido a Mora.[29]

Además, es un hecho cierto que el huracán María causó <u>daños adicionales</u> tanto al techo como a la pintura del edificio. Al respecto, el señor Kimsi Palacios – ajustador independiente contratado por Chubb y testigo de la parte apelante – reconoció que tanto el edificio como el techo sufrieron daños por los impactos y la corrosión de los vientos ocasionados por el huracán.[30] Kimsi Palacios declaró que eran evidentes los daños ocasionados por el huracán.[31] *"No podemos nada más tomar, este una sección del techo porque estaba dañado, hay que pintarlo completo"*. En el caso del impermeabilizante dijo *"alcanzamos a apreciar que había daños por impacto y, pues, básicamente tenemos que reemplazar la totalidad del material impermeabilizante"*.[32] Por su parte, el señor López Ortiz – ajustador

---

[29] Véase, determinación de hecho #110 de la Sentencia. La parte apelante no presentó la transcripción del testimonio vertido por el señor López Ortiz – testigo de Mora - durante el juicio. Por lo que le damos total deferencia a las determinaciones del TPI en cuanto a dicho testigo. Véase, además, transcripción de la prueba oral de 25 de febrero de 2020, pág. 43, L: 2-19.

[30] Transcripción de la prueba oral de 25 de febrero de 2020, pág. 44, L: 9-19 y pág. 50, L: 9-25.

[31] *Id.*, pág. 50, L: 25 y pág. 51, L: 1-2.

[32] *Id.,* pág. 30, L: 9-16.

interno en Chubb que trabajó la reclamación del Condominio – aseguró que podía distinguir qué daños incluidos en la reclamación eran producto del paso del huracán y cuáles no.[33] Quedó establecido que ello es un asunto técnico que ciertamente no le correspondía al Consejo de Titulares dirimir como asegurado.[34] Adviértase que el Consejo de Titulares contrató un ajustador público para esos fines. Así, luego de la investigación correspondiente, Chubb indemnizó al Consejo de Titulares por estas y otras partidas en cumplimiento con los deberes y responsabilidades plasmados en el contrato de seguro. De manera que no cabe hablar sobre contradicciones, ni reclamaciones excluyentes entre sí como propone Mora.

Cónsono con lo anterior, resolvemos que la indemnización concedida por el TPI para cubrir los vicios o defectos relacionados a la pintura exterior del edificio, la impermeabilización del techo y la reparación del tanque de agua no constituye una doble compensación.

Como discutiéramos, la aplicación de la doctrina de fuente colateral depende de los hechos particulares de cada caso. Atemperada a nuestra controversia, el TPI debía analizar el origen y propósito del pago realizado por Chubb a favor del Consejo de Titulares por las partidas en cuestión y, además, determinar si dicho pago estaba relacionado al causante de los vicios o defectos de construcción – en este caso, Mora.

De las circunstancias que anteceden surge que el origen y propósito de la compensación dada por Chubb a favor del apelado es separada y distinta a la reclamada contra Mora - concedida por el TPI. Ambas surgen de eventos distintos. Por un lado, la demanda por vicios de construcción surgió en el 2016 debido a la negligencia

---

[33] Véase, determinación de hecho #111 de la Sentencia. La parte apelante no presentó la transcripción del testimonio vertido por el señor López Ortiz durante el juicio. Por lo que le damos total deferencia a las determinaciones del TPI en cuanto a dicho testigo.
[34] *Id.*, determinación de hecho #112.

de Mora durante la construcción del Condominio. Mientras que la reclamación a Chubb surgió de hechos ocurridos en el 2017 tras el paso del huracán María. Evidentemente, lo anterior demuestra que el pago realizado por Chubb – quien es un tercero en la relación entre Mora y el Consejo de Titulares - no tiene correlación alguna con los defectos o vicios de construcción originalmente causados y reclamados a Mora, puesto que el pago de la aseguradora surge de un contrato de póliza de seguro. Por tanto, la compensación otorgada al Consejo de Titulares por la aseguradora no tiene el efecto de eximir de responsabilidad a Mora.

En consecuencia, ante la falta de prueba en contrario sobre la existencia de defectos o vicios relacionadas a pintura del edificio, la impermeabilización del techo y el tanque de bomba de agua, resolvemos que el TPI no incidió al compensar dichas partidas.

En segundo orden, Mora cuestiona la concesión de otras partidas por entender que no constituyen vicios de construcción. Estas son: partida **(c)** - "instalar extensión de mofle de la planta eléctrica para cambiar la dirección en la que bota el humo y pintar la base de la planta eléctrica"; partida **(h)** – "reemplazar alfombra modular del gimnasio que estaba en mal estado y levantada"; y partida **(w)** – "elevar el nivel de la planta eléctrica exterior [...]".

En cuanto a las partidas (c) y (h), aun cuando el perito Ing. Bigas Mulero declaró que las mismas no eran requeridas por los planos de construcción, su testimonio nos lleva a concluir que son compensables bajo el concepto de "defectos de construcción" definido en el Reglamento 2268 del DACo .[35] La Sec. 1 del aludido reglamento define "defectos de construcción" como:

> *[c]ualquier anormalidad, defecto, falta de accesorios, falla, deterioro prematuro, mal funcionamiento, inexactitud en las medidas o cualesquiera otra condición más allá de las tolerancias normales permisibles que pueda sufrir la*

---

[35] Reglamento Núm. 2268 de 17 de agosto de 1977, conocido como *Reglamento para regular las distintas actividades que se llevan a cabo en el Negocio de la Construcción de viviendas privadas en Puerto Rico, según enmendado.*

*estructura de vivienda o el área en que ésta esté enclavada o cualquier otro vicio o condición que exceda la medida de las imperfecciones que cabe esperar en una construcción sin que se pueda imputar a una fuerza mayor y/o fenómeno natural, y que no se deba a maltrato, alteraciones, falta de mantenimiento, ni desgastes normal, siempre y cuando se notifiquen al urbanizador y/o constructor dentro del periodo de tiempo que establece el Art. 10(j) de este Reglamento.*[36]

En el presente caso, el Ing. Bigas Mulero declaró que la extensión del *muffler* de la planta eléctrica era conveniente instalarlo puesto que el humo circula hacia los apartamentos de la parte baja del edificio Este.[37] Además, testificó que la planta ubica en un área inundable.[38] Mora no presentó prueba en contrario. Ante tales circunstancias colegimos que dichas condiciones repercuten en un mal funcionamiento de la planta eléctrica, no tolerable ni permisible que atenta a la seguridad de los residentes. De manera que el TPI no erró al considerar las partidas (c) y (h) como defectos o vicios de construcción a ser resarcidos por Mora.

Ahora, en cuanto a la <u>partida (h)</u> sobre el reemplazo de la alfombra del gimnasio, cabe señalar que el TPI descartó la misma. El foro primario condenó a Mora a satisfacer *"[l]a suma de $443,221.46 en concepto de las deficiencias o defectos incluidos en la determinación de hecho número 38, **exceptuando los incisos (h), (u) y (v)"*.[39] Confirmamos que los $5,995.75 atribuidos al cambio de la alfombra no están incluidos en los $443,221.46 adjudicados por el foro apelado. Por lo cual, resulta innecesario entrar a discutir asunto alguno relacionado a tal partida.

Por otra parte, Mora aduce que el valor adjudicado por las siguientes partidas no encuentra apoyo en la prueba toda vez que el Ing. Bigas Mulero no presentó un estimado de los costos: partida **(o)** – "tratamiento impermeabilización de trechos de la entrada de los

---

[36] Énfasis suplido.
[37] Transcripción de la prueba oral de 3 de febrero de 2020, pág. 45, L:14-25 y pág. 46, L:1.
[38] *Id.*, pág. 25, L: 7-14.
[39] Apéndice 8 del recurso de apelación, pág. 72. Énfasis nuestro.

edificios y terraza de la piscina" ($5,000.00); partida **(t)** – "reparación de los receptáculos dañados en el estacionamiento" ($360.00); partida **(v)** – "reemplazo del aire acondicionado de cinco toneladas en el salón de actividades" ($5,000.00); y partida **(z)** – "marmolizar la piscina y llenarla de agua" (15,000.00).

Como dijéramos, el TPI también **excluyó** categóricamente de la indemnización por vicios de construcción la partida (v) sobre el aire acondicionado del salón de actividades; por tanto, no consideraremos planteamiento alguno sobre dicha partida. Ahora bien, en cuanto al restante de las partidas surge que el estimado se hizo a base de los costos en el mercado, mediante *"lump sum"*. El Ing. Bigas Mulero declaró que dicho método es permitido en la industria cuando se trata de cantidades pequeñas.[40] Nos merece entera credibilidad sus más de treinta años de experiencia en el campo de la construcción y en la realización de inspecciones. Además, adviértase que Mora no presentó prueba en contrario para rebatir los costos estimados por el perito de la parte apelada.

Por tanto, toda vez que quedó demostrado la existencia de los defectos o vicios de construcción relacionados a la impermeabilización de techos, marmolización de la piscina y cambio de receptáculos y, que Mora no logró rebatir los costos estimados por el perito de la parte apelada, resolvemos que el TPI no erró al indemnizar al Consejo de Titulares por tales partidas.

En definitiva, ante la ausencia de evidencia en el expediente apelativo que apunte a un error en la apreciación de la prueba por el foro primario, concluimos que no incidió al conceder a favor del Consejo de Titulares la suma de $433,221.46 por concepto de las deficiencias o defectos de construcción incluidos en la

---

[40] Transcripción de la prueba oral de 3 de febrero de 2020, pág. 115, L:10-17.

determinación de hecho #38 del dictamen apelado, conforme a lo allí intimado.

**-IV-**

Por los fundamentos expuestos, se confirma la Sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones